# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICK O'TOOLE, | : | |
| **Plaintiff,** | : | **Civil Action No. 3:16-01663** |
| **v.** | : | |
| | | **(Judge Mannion)** |
| NANCY BERRYHILL[1], **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM

The above-captioned action is one seeking review of a decision of the Acting Commissioner of Social Security ("Commissioner"), denying Plaintiff Patrick O'Toole's ("O'Toole") application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI, respectively. For the reasons set forth below, the Court will affirm the Commissioner's decision.

## I. BACKGROUND

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for Carolyn W. Colvin, Acting Commissioner of Social Security as the defendant in this suit.

paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that O'Toole met the insured status requirements of the Social Security Act through March 31, 2013. (Tr. 13).[2] In order to establish entitlement to disability insurance benefits, O'Toole was required to establish that he suffered from a disability on or before that date. 42 U.S.C. §423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

SSI is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

O'Toole protectively applied for DIB and SSI on April 3, 2013, alleging disability beginning July 15, 2007, which he later amended to December 20, 2012. (Tr. 11, 26, 146-57). His claims were initially denied on August 21, 2013. (Tr. 90-97). O'Toole requested a hearing before the Administrative Law Judge ("ALJ") Office of Disability and Adjudication and Review of the Social Security Administration, and one was held on November 7, 2014. (Tr. 23-63, 98-100). At the hearing, O'Toole was represented by counsel, and a

---

[2] References to "Tr. __" are to pages of the administrative record filed by the Defendant as part of the Answer (Docs. 8 and 9) on October 13, 2016.

vocational expert testified. (Tr. 23-63). On December 3, 2014, the ALJ issued a decision denying O'Toole's applications. (Tr. 8-22). O'Toole filed a request for review with the Appeals Council, which was denied. (Tr. 1-5). Thus, the ALJ's decision stood as the final decision of the Commissioner.

O'Toole filed a complaint with this Court on August 10, 2016. (Doc. 1). The Commissioner filed an answer on October 13, 2016. (Doc. 8). After supporting and opposing briefs were submitted (Docs. 10, 11, 12), the appeal[3] became ripe for disposition.

O'Toole appeals the ALJ's determination on three grounds: (1) substantial evidence does not support the ALJ's step two finding that some of his medical conditions were not severe; (2) substantial evidence does not support the ALJ's Residual Functional Capacity ("RFC") assessment; and (3) substantial evidence does not support the ALJ's credibility evaluation.

## II. **STANDARD OF REVIEW**

When considering a social security appeal, the Court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91 (3d Cir. 2007); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008). However, our review of the Commissioner's

---

[3] Under the Local Rules of Court, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

findings of fact pursuant to 42 U.S.C. §405(g) is to determine whether those findings are supported by "substantial evidence." Id. The factual findings of the Commissioner, "if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. §405(g). "Substantial evidence does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Johnson, 529 F.3d at 200 (3d Cir. 2008) (quoting Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)) (internal quotations and citations omitted). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (citing Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995)) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). The United States Court of Appeals for the Third Circuit has stated,

> [O]ur decisions make clear that determination of the existence *vel non* of substantial evidence is not merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (citing Kent v. Schweiker,

710 F.2d 110, 114 (3d Cir. 1983); Gilliland v. Heckler, 786 F.2d 178, 183 (3d Cir. 1986)). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Id. (citing Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981)).

## III. SEQUENTIAL EVALUATION PROCESS

The plaintiff must establish that there is some "medically determinable basis for an impairment that prevents him from engaging in any substantial gainful activity for a statutory twelve-month period." Fargnoli v. Massanari, 247 F.3d 34, 38-39 (3d Cir. 2001) (quoting Plummer, 186 F.3d at 427) (internal quotations omitted). "A claimant is considered unable to engage in any substantial gainful activity 'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .' " Fargnoli, 247 F.3d at 39 (quoting 42 U.S.C. §423(d)(2)(A)). The Commissioner follows a five-step inquiry pursuant to 20 C.F.R. §404.1520 to determine whether the claimant is disabled. In Plummer, the Third Circuit set out the five-steps:

In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. §[404.]1520(a). If a claimant is found to be engaged in

substantial activity, the disability claim will be denied. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987) . . . . In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. §404.1520©. If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits. In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. §404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. §404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. <u>Adorno v. Shalala</u>, 40 F.3d 43, 46 (3d Cir. 1994).

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. §404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the

national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. See 20 C.F.R. §404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. See, [sic] Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

Plummer, 186 F.3d at 428.


## IV. FACTS

O'Toole was born on January 28, 1970, has a limited education, and is able to communicate in English. (Tr. 18). In the past, O'Toole worked as a machine feeder, commercial cleaner, bakery helper, laborer stores, and as a kitchen helper. (Tr. 17-18). O'Toole has not engaged in substantial gainful activity since the alleged amended onset date of disability, December 12, 2012 (Tr. 13).

### A. O'Toole's Impairments

O'Toole has a history of type 1 diabetes mellitus, chronic renal insufficiency, and hyperlipidemia. (Tr. 726). He received medical care for these conditions at Milton S. Hershey Medical Center ("Hershey"). (Tr. 247-717, 726-975). Deborah Shepherd, MSN, CRNP, of Hershey's Endocrinology

Department, reported on December 4, 2012, that O'Toole's diabetes improved with the help of a dietician. (Tr. 644). This was an improvement since O'Toole previously reported that he was sick of taking care of his diabetes. (Tr. 645). Nurse Shepherd prescribed management with Humalog, Insulin, and glucose tablets. (Tr. 645).

On December 20, 2012, O'Toole saw his primary care physician, Munima Nasir, M.D. (Tr. 639-40). Dr. Nasir noted that O'Toole had been "extremely poorly compliant with his care," however, he "seem[ed] to be doing better" since reestablishing endocrinological care. (Tr. 639). Dr. Nasir noted his history of type 1 diabetes mellitus with diabetic nephropathy, neuropathy and retinopathy. (Id.). O'Toole stated that he was doing fairly well and denied acute issues. (Id.). His physical examination was unremarkable and Dr. Nasir recommended follow-up with Endocrinology. (Tr. 639-40).

A January 14, 2013 nutrition outpatient note provides that O'Toole is "very happy with how things have worked since he is doing intense carb counting," and that he "loves" his insulin pens. (Tr. 634). It was further noted that he lives with his parents, is a landscaper, and was advised to continue to complete food and glucose records and to bring with him to his next appointment on February 11, 2013. (Id.). His follow up nutrition appointment in February again noted that he loves his insulin pens, but that his glucose logs and food records were incomplete and he has not been landscaping because he has been ill and very tired. (Tr. 631).

O'Toole had a consultation for chronic kidney disease with Christin Spatz, M.D. on February 18, 2013. (Tr. 623). Dr. Spatz noted that O'Toole has suffered from diabetes type 1 since the age of 20. (Id.). She also indicated other medical complications of nephropathy, retinopathy and neuropathy. (Id.). His symptoms included fatigue, feeling cold, left-sided pain and reduced appetite. (Id.). Dr. Spatz noted that O'Toole had very poorly controlled diabetes and was lost to follow-up with endocrinology due to noncompliance, but that he has recently reestablished with endocrinology and has continued to improve his blood sugar control. (Id.). She also noted that he was remarkable for hyperlipidemia, but does not currently take his cholesterol medicine. (Id.). With regard to his chronic kidney disease care, Dr. Spatz noted that his renal function has remained stable for the last 3 years but that he does have significant proteinuria, and explained to him the importance of blood sugar control in preserving his renal function. (Tr. 624).

On March 8, 2013, O'Toole presented to the Hershey Medical Center emergency room with complaints of nausea with vomiting of dark emesis after arrival to the emergency room. (Tr. 606). A CT scan of his abdomen revealed no evidence of acute intrathoracic, intra-abdominal, or intrapelvic pathology, but greater than expected calcific atherosclerosis for his age. (Tr. 607). O'Toole was discharged on March 10, 2013 with a diagnosis of upper gastrointestinal bleed, anxiety/depression, hyperlipidemia, and diabetes, type 1. (Tr. 610).

On April 14, 2013, O'Toole again presented to the Hershey Medical Center emergency room with complaints of left upper extremity paresthesia, as well as symptoms of blurry vision and left arm/shoulder pain. (Tr. 585). The examining physician diagnosed transient ischemic attack (TIA) and referred him to neurology. (Tr. 581-85). O'Toole's mental status, cranial nerves, motor strength and tone, reflexes, sensation, and coordination were normal. (Tr. 582, 586-86). A head CT and brain MRI/MRA revealed no acute pathology (Tr. 581), and he refused admission for further work up, including a neck MRA. (Tr. 581). He was discharged in improved condition on the same day. (Tr. 588).

The next day, April 15, 2013, O'Toole was seen by Dr. Spatz for a follow up for his chronic kidney disease. (Tr. 569). Dr. Spatz noted that O'Toole did not complete the majority of his testing that she requested. (Id.). O'Toole told Dr. Spatz that he felt frustrated by his medical care, and that he could not stay very long for his appointment because he had to help his brother move. (Id.). Dr. Spatz noted that O'Toole has not been very adherent to his medications and is certainly not aware of the gravity of his medical conditions. (Id.). Physical examination revealed normal findings, and Dr. Spatz reported that O'Toole's renal function remains stable and that his hypertension is well controlled. (Tr. 570). Dr. Spatz noted that O'Toole's medical conditions include diabetes mellitus and hypertension, as well as chronic kidney disease state III secondary to diabetic nephropathy. (Id.). A nutrition therapy visit on

that same day also indicated that O'Toole had not been keeping his glucose or food records. (Tr. 577).

On August 5, 2013, O'Toole presented to Dr. Nasir, primarily for a follow up visit. (Tr. 664). Dr. Nasir provides that O'Toole follows in and out with his diabetic control; that at any time, he is well controlled and does really well and knows how to do it, however, O'Toole admits that over the course of the last two or three months, he has fallen off of his regimen again and has not been taking meals appropriately. (Tr. 664). O'Toole complains of feeling extremely fatigued and tired with no energy. (Id.). He complains of burning sensation in his lower extremities and stated that he had low vitamin D as well as anemia but had not been taking his medications because he could not afford it. (Id.). Dr. Nasir's diagnosis was diabetes mellitus type 1, uncontrolled; persistent fatigue and tiredness; vitamin D deficiency; and peripheral neuropathy. (Tr. 664-65). Dr. Nasir provided that the cause behind O'Toole's fatigue and tiredness is from his uncontrolled blood sugar levels along with vitamin D deficiency, and encouraged O'Toole to get back on his regimen. (Tr. 665). Dr. Nasir also provided that the burning sensation in O'Toole's feet is associated with his diabatic neuropathy and that with better control of his blood sugars will aid in better control of his symptoms. (Id.).

On October 10, 2013, O'Toole had another follow up visit with Dr. Nasir. (Tr. 949). Dr. Nasir's notes again provide that O'Toole has periods where he does very well with his diabetic care and his diabetes is fairly well controlled;

11

however, at other times, he is totally noncompliant and due to this noncompliance, his chronic disease is not well managed. (Id.). Dr. Nasir notes that at this office visit, O'Toole again complained of fatigue, nausea, feeling down and depressed and excessive sleep. (Id.). Dr. Nasir provided that O'Toole had not had routine follow up with the endocrinology clinic, and that at his last visit, Dr. Nasir counseled O'Toole extensively, asking him to go back on his diabetic regimen to start taking better care of his diabetes. (Id.). Dr. Nasir notes that despite O'Toole acknowledging that his food portion sizes are too large for him, and that he is consuming a large amount of carbohydrates with lots of bread, he continues to do it. (Id.).

O'Toole's only other complaint at his October 10, 2013 visit was decreased range of motion of his left shoulder. (Tr. 950). Dr. Nasir referred him to physical therapy. (Id.).

On October 25, 2013, O'Toole was seen by Ms. Shepherd at the Endocrinology Clinic for management of his type 1 diabetes, uncontrolled. (Tr. 940). Ms. Shepherd provided that she had a long discussion with O'Toole about his choice to continue with poor control, although educated about the risk factors. (Id.). O'Toole stated that he is able to control his blood sugars when he wants to, but blames the poor control on being sedentary and eating poorly. (Id.). Ms. Shepherd's notes also indicate that O'Toole is working as a landscaper. (Id.). She ordered him a glucagon emergency kit. (Tr. 941).

O'Toole's physical therapy note on November 4, 2013, indicates left

shoulder adhesive capsulitis and was ordered 8 weeks of physical therapy to address range of motion, stability, flexibility, and functional ability deficits. (Tr. 930-33).

Dr. Nasir again saw O'Toole for a follow up appointment on November 18, 2013. (Tr. 909). Dr. Nasir notes that since his last visit, O'Toole has become more compliant with his care and that he has been receiving physical therapy for his shoulder, with slight improvement in range of motion. (Tr. 909-10). On February 24, 2014, Dr. Nasir again saw O'Toole for a follow up appointment. (Tr. 902). O'Toole reported improved diabetic control, compliance with his medications for hypertension and hyperlipidemia, and significant improvement in left frozen shoulder symptoms. (Id.).

### B. Residual Functional Capacity Assessments

On August 20, 2013, Gordon Arnold, M.D., a state agency medical consultant, assessed O'Toole's functional abilities. (Tr. 70-87). Dr. Arnold found that O'Toole was able to lift and carry ten pounds occasionally and less than ten pounds frequently. (Tr. 73, 82). He opined that O'Toole could stand and walk for two hours and sit for six hours in an eight-hour workday, and required the ability to alternate sitting and standing. (Id.). Dr. Arnold opined that O'Toole had no limitation in his ability to push or pull other than indicated by his ability to lift and carry. (Id.). He further found that O'Toole was unable to climb ladders, ropes, and scaffolds, or crawl, but was able to climb ramps and stairs occasionally, and balance, stoop, kneel, and crouch occasionally.

(Tr. 74, 83). Dr. Arnold further opined that O'Toole had no manipulative, visual, or communicative limitations, and that he should avoid concentrated exposure to extreme temperatures and hazards, such as machinery or heights. (Tr. 74-76; 83-85).

The record also contains a letter from Annette Durica, MA, regarding O'Toole's alleged psychiatric health. (Tr. 976). Ms. Annette noted that O'Toole has the diagnostic criteria of an autism spectrum disorder, paranoid personality disorder, and schizotypal personality disorder with difficulty recognizing social cues, impaired conflict resolution abilities, avoidance of others, and social awkwardness, poor impulse control, and irritability. (Id.). She further provides that even a solitary sort of employment will be difficult for him because he has no education or skills and the social interaction required to acquire skills is probably beyond his social capability. (Id.).

### C. The Administrative Hearing

On November 7, 2014, an administrative hearing was conducted. (Tr. 23-63). At the hearing, O'Toole testified that he has swelling in his ankles and needs to elevate his legs. (Tr. 30-31). He further testified that he is able to stand for forty minutes to one hour, walk for twenty to forty minutes, lift and carry ten to fifteen pounds daily and up to thirty pounds without pain. (Tr. 30-33). With regard to his insulin, O'Toole acknowledged that he is supposed to check his sugars four times a day, but does not always comply. (Tr. 33-34).

After O'Toole testified, Michael Kibbler, an impartial vocational expert,

14

was called to give testimony. (Tr. 49, 57). The ALJ asked Mr. Kibbler to assume a hypothetical individual with O'Toole's age, education, and work background, who could perform light-duty work, except he could stoop, kneel, crouch, crawl, and climb stairs occasionally; he should avoid hazards, such as unprotected heights and temperature extremes; and he could stand for one hour before needing to sit for up to one hour before needing to stand again for up to one hour, with this continuing throughout the workday. (Tr. 57-61).

Mr. Kibler opined that such a person could not perform O'Toole's past work, but could make a vocational adjustment to jobs existing in significant numbers in the national economy, including the representative light occupations of small products assembler and electrical accessories assembler, and the sedentary jobs of table worker and final assembler. (Id.). Mr. Kibler further opined that all of the identified jobs could be performed if the hypothetical person were further limited to only occasional interactions with members of the public, coworkers, and supervisors. (Tr. 61).

## V. **DISCUSSION**

The ALJ went through each step of the sequential evaluation process and found that: (1) O'Toole had not engaged in substantial gainful activity since December 20, 2012, the alleged amended onset date; (2) O'Toole had the severe impairments of diabetes mellitus with diabetic neuropathy and stage III kidney disease; (3) O'Toole's impairments did not meet or equal a

listed impairment; and (4) O'Toole could not perform his past relevant work, but that he could perform light work with several limitations. (Tr. 13-15). Specifically, in addressing O'Toole's RFC, the ALJ provided the following limitations:

> [O'Toole] is able to stoop, kneel, crouch, crawl, and climb stairs occasionally. [He] should avoid hazards, such as unprotected heights, and temperature extremes. [He] is limited to standing for one hour before needing to sit for up to one hour before needing to stand again for up to one hour, with this continuing throughout the workday.

(Tr. 15).

## A. Step Two Evaluation

O'Toole contends that the ALJ committed reversible error by failing to identify diabetes retinopathy, left knee dysfunction, hypertension, hyperlipidemia, back pain, psychological conditions, shoulder adhesive capsulitis, and TIA as severe impairments. The Commissioner maintains that O'Toole's argument should be rejected for several reasons, namely, the ALJ's explanation is supported by substantial evidence; the fact that the ALJ did not identify additional conditions as severe is legally irrelevant because the ALJ identified other severe impairments at step two and proceeded through the remaining steps of the sequential evaluation process; and lastly, O'Toole has not shown that the ALJ's failure to identify his other conditions as severe harmed the outcome of his case.

"Because the outcome of a case depends on the demonstration of

functional limitations, where an ALJ identifies at least one severe impairment and ultimately properly characterizes a claimant's symptoms and functional limitations, the failure to identify a condition as severe is deemed harmless error." <u>Keys v. Colvin</u>, Civ. No. 3:14-CV-191, 2015 WL 1275367 at *11 (M.D. Pa. Mar. 19, 2014) (citing <u>Garcia v. Comm'r of Soc. Sec.</u>, 587 F. App'x 367, 370 (9th Cir. 2014) (citing <u>Lewis v. Astrue</u>, 498 F.3d 909, 911 (9th Cir. 2007); <u>Burnside v. Colvin</u>, Civ. No. 3:13-CV-2554, 2015 WL 268791 at *13 (M.D. Pa. Jan. 21, 2015). Thus, when a plaintiff claims a step two error based on an ALJ's failure to properly address an alleged impairment, the crux of the analysis is whether the ALJ considered the associated symptoms and functional limitations in his RFC analysis. See, e.g., <u>Awad v. Colvin</u>, Civ. No. 3:14-CV-1054, 2015 WL 1811692 at *13 (M.D. Pa. Apr. 21, 2015).

The ALJ identified O'Toole's diabetes mellitus with diabetic neuropathy and stage III kidney disease as severe imperilments. With regard to O'Toole's non-severe impairments, the ALJ provided that:

> The record indicates that the claimant has a history of diabetic retinopathy. The claimant underwent surgical treatment for retinopathy and cataracts. In October 2010, the claimant's corrected right eye visual acuity was 20/40 and 20/20 in his left eye. On March 20, 2013 the claimant's right eye and left eye visual acuity without correction was 20/25-2 (Exhibit 1F). The record also indicates that the claimant has a history of left knee dysfunction and underwent a removal of his left knee hardware. However, the record contains no evidence of limiting left knee symptoms since his alleged onset date. On February 24, 2014, Dr. Nasir noted that the claimant's hypertension and

hyperlipidemia remain stable and that the claimant was compliant [sic] with his medications. He noted that the claimant's alleged frozen left shoulder symptoms improved significantly with physical therapy. He noted that the claimant had no pain and improved range of motion (Exhibit 4F). Based upon the above findings, these conditions do not result in any significant limitations in the claimant's ability to perform basic work activities.

The claimant alleges back pain. However, there is no diagnosis related to his alleged back pain by an acceptable medical source ...Thus, there is no medically determinable impairment attributable to the back pain.

Annette Durica, MA, provided a letter regarding the claimant. She noted the claimant's alleged mental health and personality issues, which impact his ability to function in the workplace ... (Exhibit 5f). This assessment is given no weight and the psychological conditions identified by Ms. Durica are not considered medically determinable impairments. First, Ms. Durica is not an acceptable medical source ... Furthermore, the claimant testified that his connection with Ms. Durica is through occasional conversations that they have had while he was performing yard work for Ms. Durica (Hearing Testimony). In other words, there was no formal treatment or clinical relationship.

(Tr. 13-14).

Given the medical evidence of record and the hearing testimony, the Court finds that the ALJ's explanation adequately identifies the substantial evidentiary support for his finding that O'Toole's other medical conditions were not severe. Indeed, O'Toole has not pointed to any medical evidence suggesting limitations related to his non-severe medical conditions that were

not included in the ALJ's RFC finding. Moreover, any alleged error committed by the ALJ at the step two analysis was harmless given that the ALJ proceeded through the remaining steps of the sequential evaluation process.[4]

## B. Residual Functional Capacity

O'Toole's next argument is lodged against the ALJ's RFC assessment alleging that it is not supported by substantial evidence because the RFC is inconsistent with the definition of light work given its sit/stand limitations; the ALJ failed to discuss SSR 96-8p and whether the combined effect of his conditions rendered him disabled; and finally, the record did not contain an RFC assessment from a treating or consulting physician.[5]

The RFC reflects the most a claimant can do, rather than the least, and the ALJ expresses the RFC in terms of the highest level of exertional work that the claimant is generally capable of performing, but which is "insufficient to allow substantial performance of work at greater exertional levels." SSR 83-

---

[4] O'Toole also avers that the ALJ erred by failing to consider Listing 9.00. This is a challenge to the ALJ's step-three finding. Under Listing 9.00, a claimant with an endocrine disorder like diabetes mellitus, must show that his endocrine disorder has caused him to meet or equal the criteria of a listing for another body system. See 20 C.F.R. Pt. 404, Subpt. P, App 1, §9.00(B)(5). The burden is on O'Toole to prove presumptive disability at step three. His one sentence allegation fails to meet his burden here.

[5] O'Toole's argument that the record did not contain an RFC assessment from a treating or consulting physician was brought in his first argument, but given its relatedness to step four of the sequential evaluation process, the Court will address it here.

10, 1983 WL 31251 at *12; see also SSR 96-8p, 1996 WL 374184 at *2 (recognizing an RFC represents the most that individual can do given limitations). The ALJ must then determine whether the claimant's RFC permits him to perform the full range of work contemplated by the relevant exertional level. SSR 83-10, 1983 WL 31251 at *5. "[I]n order for an individual to do a full range of work at a given exertional level the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level." SSR 96-8p, 1996 WL 374184 at *3. If the claimant's combined exertional and nonexertional impairments allow him to perform some of the occupations classified at a particular exertional level, but not all of them, the occupational base at that exertional level will be reduced to the extent that the claimant's restrictions and limitations prevent him from doing the full range of work contemplated by the exertional level. See SSR 83-14, 1983 WL 31254 at *6 ("Where it is clear that additional limitations or restrictions have significantly eroded the exertional job base set by the exertional limitations alone, the remaining portion of the job base will guide the decision."). The "ALJ generally must accept evidence from a vocational expert, who, based on the claimant's age, education, work experience, and RFC, testifies whether there are jobs for such a person in the national economy." Morgan v. Barnhart, 142 F. App'x 716, 720-21 (4th Cir. 2005).

At the administrative hearing, the ALJ provided the vocational expert with a number of hypothetical questions. (Tr. 57-61). The ALJ asked the

vocational expert whether there were jobs that someone with O'Toole's age, education, and capable of light-duty work could perform if that person is limited to only occasional stooping, kneeling, crouching, crawling, and climbing stairs; and must avoid hazards such as unprotected heights and temperature extremes. (Tr. 57). The vocational expert testified that this hypothetical individual, with those limitations, could perform a number of jobs in the national economy such as a small products assembler and electrical accessories assembler. (Tr. 58-59). The ALJ asked the vocational expert to assume the same limitations as contained in the first hypothetical question, but the hypothetical individual was further limited to sitting one hour before needing to stand for up to one hour before needing to sit again for one hour and so forth throughout the day. (Tr. 59). The vocational expert testified that the hypothetical individual could still perform work as a products assembler and electrical accessories assembler, but would reduce the numbers by fifty percent. (Tr. 59). The ALJ then asked the vocational expert to assume the same limitations, but to further limit the hypothetical individual to only occasional interactions with member[s] of the public, coworkers, and supervisors. (Tr. 61). The vocational expert testified that the hypothetical individual could still perform work as a small products assembler and electrical accessories assembler and that the numbers reduced by fifty percent in the previous hypothetical would remain the same. (Tr. 61).

The ALJ also asked the vocational expert to assume the same

limitations as contained in the first hypothetical question, but to limit the work to sedentary work. (Tr. 59). The vocational expert testified that the hypothetical individual could perform work as a table worker and final assembler. (Tr. 59). The ALJ asked the vocational expert to assume the same limitations as contained in the above hypothetical question, but to further limit the hypothetical person to sitting one hour before needing to stand one hour before needing to sit again for one hour throughout the course of the workday. (Tr. 60). The vocational expert testified that the hypothetical individual could still perform work as a table worker and final assembler, but would reduce the numbers by fifty percent. (Tr. 60). Finally, the ALJ asked the vocational expert to assume the same limitations, but to further limit the hypothetical individual to only occasional interactions with members of the public, coworkers, and supervisors. (Tr. 61). The vocational expert testified that the hypothetical individual could still perform work as a table worker and final assembler and that the numbers reduced by fifty percent in the previous hypothetical would remain the same. (Tr. 61).

The ALJ adopted the limitations as set forth in his hypothetical questions posed to the vocational expert as follows: the claimant has the residual functional capacity to perform light work; is able to stoop, kneel, crouch, crawl, and climb stairs occasionally; should avoid hazards, such as unprotected heights and temperature extremes; and is limited to standing for one hour before needing to sit for up to one hour before needing to stand

again for up to one hour, with this continuing throughout the day. (Tr. 15).

O'Toole attacks the adequacy of the ALJ's RFC and the ALJ's alleged failure to consider whether the totality of conditions render him disabled pursuant to SSR 96-8p. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184 at *1. The Ruling provides that the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. Id. at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." Id.

The Court finds that the ALJ thoroughly considered O'Toole's description of his activities and symptoms, his medical records, the evaluations and opinions of medical experts who did and did not examine him, and his testimony at the administrative hearing in arriving at the RFC finding. (Tr. 13-17). Under the applicable regulation, "light work" is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or

when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§404.1567(b), 416.967(b); see also SSR 83-10, 1983 WL 31251 at *5-6. "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251 at *6. In contrast, "sedentary work" is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §416.967(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Id.; see also SSR 83-10, 1983 WL 31251 at *5 (defining sedentary work).

SSR 83-14 provides:

> The major difference between sedentary and light work is that most light jobs - particularly those at the unskilled level of complexity - require a person to be standing or walking most of the workday. Another important difference is that the frequent lifting or carrying of objects weighing up to 10 pounds (which is required for the full range of light work) implies that the worker is able to do occasional bending of the stooping type; i.e., for no more than one-third of the workday to bend the body downward and forward be bending the spine at the waist.

SSR 83-14, 1983 WL 31254 at *4; see also SSR 83-10, 1983 WL 31251 at *5 (explaining that the "good deal of walking or standing" in light jobs is "the primary difference between sedentary and most light jobs."). While there are "[r]elatively few unskilled light jobs ... performed in a seated position," there are unskilled light jobs accommodating a standing or walking limitation nonetheless. SSR 83-10, 1983 WL 31251 at *5.

Further, an ALJ need not rigidly apply exertional categories to a claimant's impairments; instead, where additional limitations exist such that a claimant does not fall neatly within an exertional category, an ALJ should take those limitations into account when determining a claimant's RFC and appropriately reduce the occupational base to fit the claimant's individual characteristics at step five of the process. See 20 C.F.R. §§404.1569, 416.969; SSR 83-12, 1983 WL 31253 at *2 (noting that an adjudicator is to consider the extent of erosion of occupational base and "access its significance").

O'Toole's citation to SSR 83-10 does not support his contention. As discussed above, SSR 83-10 sets out the definition for the *full range* of light work. 1983 WL 31251 at *5-6. The definition of light work includes jobs that can be performed while "sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls," SSR 83-10, 1983 WL 31251 at *5, and O'Toole does not argue nor do the medical records establish that he cannot perform those requirements. Moreover, SSR 83-10 recognizes that

there are unskilled light level jobs that may be performed from a seated position. Id.; see Lackey v. Colvin, Civ. No. 12-CV-516, 2013 WL 1903662 at *2 (W.D. Pa. May 7, 2013) (rejecting claimant's argument that four-hour standing and walking limitation was inconsistent with ability to perform light work). The ALJ did not find that O'Toole could perform the full range of light work; rather, the ALJ found that O'Toole could perform a reduced range of light work given his limitations. Accordingly, O'Toole's contention that his standing and walking limitations per se restrict him to sedentary exertional work is not persuasive. Furthermore, even assuming that there was not support for the finding that O'Toole could perform light work, it ultimately would not matter. The vocational expert also identified two positions at the sedentary level that O'Toole could perform.

O'Toole's final argument with regard to the RFC is that the record did not contain an RFC assessment from a treating or consulting physician. O'Toole further contends that the ALJ should have requested an opinion from his treating physician or sent him to internal medicine and psychological consultative examinations. These arguments are unpersuasive.

It is the ALJ's sole responsibility to determine a claimant's RFC. See generally SSR 96-5p, 1996 WL 374183. However, " '[r]arely can a decision be made regarding a claimant's [RFC] without an assessment from a physician regarding the functional abilities of the claimant.' " Biller v. Acting Comm'r of RI Soc. Sec., 962 F.Supp. 2d 761, 778-79 (W.D. Pa. 2013) (quoting Gormont

v. Astrue, Civ. No. 11-CV-2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013). That is because an ALJ is not permitted to make speculative inferences from the record or "substitute his own judgment for that of a physician." Id. (citations omitted). He must have something upon which to ground his findings; typically, an opinion from an acceptable medical source. Statements "about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions" are "medical opinions" which must be weighed and considered according to the rules. 20 C.F.R. §404.1527(a)(2); see 20 C.F.R. §404.1527(d). Accordingly, while "[t]here is no legal requirement that a physician have made the particular findings that the ALJ adopts in the course of determining an RFC," Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006), a physician's medical opinion on a matter not reserved to the Commissioner must be properly considered. Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).

Upon reviewing the evidence, the ALJ found that O'Toole can perform light work with restrictions as set forth above. In crafting this RFC, the ALJ considered the medical evidence of the record, including the opinion evidence from Dr. Arnold, a state agency medical consultant,[6] and O'Toole's own

---

[6] SSR 96-6p provides that "[s]tate agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act. As members of the teams that make determinations of disability at the initial and

testimony. Dr. Arnold, a non-examining source, is a physician that provided a medical or other opinion in this case. See SSR 96-6p; 20 C.F.R. §404.1502. The ALJ found that Dr. Arnold's opinions regarding O'Toole's limitations were consistent with the medical evidence of the record, other than his opinion regarding O'Toole's ability to lift and carry ten pounds occasionally and less than ten pounds frequently. (Tr. 17). However, the ALJ adequately explained that this portion of the opinion was inconsistent with O'Toole's own testimony wherein he testified that he is able to lift up to thirty pounds without pain and lifts and carries ten to fifteen pounds daily. (Id.).

Furthermore, the ALJ is under no obligation to order a consultative examination when the information he needs is already available to him from the medical sources in the record. See 20 C.F.R. §§404.1519, 416.919 ("The decision to purchase a consultative examination will be made on an individual case basis in accordance with the provisions of §§404.1419(a)-(f)" and "416.919(a)-(f)"); 20 C.F.R. §404.1519(a), 416.919(a) ("If we cannot get the information we need from your medical sources, we may decide to purchase a consultative examination."). Here, the record was sufficient to allow the ALJ

---

reconsideration levels of the administrative review process (except in disability hearings), they consider the medical evidence in disability cases and make findings of fact on the medical issues, including, but not limited to, the existence and severity of an individual's symptoms, whether the individual's impairment(s) meets or is equivalent in severity to the requirements for any impairment listed in 20 C.F.R. pt. 404, subpt. P., app.1, and the individual's residual functional capacity." SSR 96-6p, 1996 WL 374183.

to determine O'Toole's RFC without the need to order a consultative examination. Accordingly, the Court finds that the ALJ's RFC assessment is supported by substantial evidence.

### C. Credibility Evaluation

O'Toole's final argument challenges the ALJ's credibility evaluation, arguing that the ALJ erred by: (1) drawing an adverse inference from O'Toole's failure to comply with treatment; (2) citing O'Toole's activities of daily living; and (3) failing to conduct a proper pain analysis.

The ALJ is charged with the responsibility of determining a claimant's credibility. See Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974). The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." SSR 96-7p. The Third Circuit has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.' ' Coleman v. Comm'r of Soc. Sec. 440 F. App'x 252, 253 (3d Cir. 2012) (quoting Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." Pysher v. Apfel, Civ. No. 00-CV-1309, 2001 WL 793305 at *3 (E.D. Pa. July 11, 2001) (citing Van Horn v. Schwieker, 717 F.2d

871, 873 (3d Cir. 1983); <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 612 (3d Cir. 2014) (an ALJ's credibility determination is entitled to great deference). An ALJ is not required to specifically mention relevant Social Security Rulings. See <u>Holiday v. Barnhart</u>, 76 F. App'x 479, 482 (3d Cir. 2003). It is enough that the ALJ's analysis by and large comports with relevant provisions. <u>Id</u>.

The ALJ provided a detailed explanation to support his determination that O'Toole's allegations regarding the limiting effects of his alleged conditioners were not fully credible. (Tr. 15-17). For example, the ALJ cited to the medical records to show that O'Toole's chronic kidney dysfunction and neuropathy were the result of his elevated blood sugar levels due to non-compliance with his treatment regimen, but that his blood sugar levels may be effectively controlled with adherence to his insulin regimen and proper diet. (Exhibits 1F and 4F). The record is replete with O'Toole's doctors advising him of the importance of his blood sugar control and dietary moderations, which he fully acknowledged, but nevertheless, continued with poor control over his eating habits and blood sugar management. (Tr. 664, 940, 949).

The ALJ further pointed to Dr. Spatz's finding that O'Toole's renal function remained overall stable for the last three years and the continual advisement to O'Toole of the importance of blood sugar control. (Exhibit 4F). Moreover, the ALJ explained that the medical records show that O'Toole presented without peripheral edema, intact gait, and no weakness upon examination with Dr. Spatz. (Exhibit 4F). Finally, the ALJ reasoned that

O'Toole's own reported activities of daily living present inconsistencies with his allegations. (Tr. 17). O'Toole testified that he was able to do his laundry, drive, shop in stores, as well as perform yard work for others. (Tr. 14, 17). 20 C.F.R. §404.1529(c)(3) (activities of daily living are properly considered in determining credibility).

Thus, the ALJ's assessment and the medical record belies O'Toole's credibility arguments. The ALJ noted O'Toole's lack of credibility and cited many bases for his findings. The ALJ properly concluded that his complaints were not consistently supported by medical treatment records, or by his own description of his conditions. Given these conflicts in the evidence, the ALJ as fact-finder, was entitled to give greater weight to this other objective medical evidence, objective evidence which did not support his claims. Recognizing that the "substantial evidence" standard of review prescribed by statue is a deferential standard of review, which is met by less than a preponderance of evidence but more than a mere scintilla of proof, the Court concludes that the ALJ's decisions assessing this competing proof regarding O'Toole's ability to function despite his various claimed impairments was supported by substantial evidence.

## VI. <u>CONCLUSION</u>

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Accordingly, pursuant to

42 U.S.C. §405(g), the decision of the Commissioner will be affirmed. An appropriate order will be entered.

S/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

Dated: April 26, 2017

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2016 MEMORANDA\16-1663-01.wpd